Madlyn Gleich Primoff, Esq.
madlyn.primoff@freshfields.com
Alexander Adams Rich, Esq.
alexander.rich@freshfields.com
FRESHFIELDS BRUCKHAUS DERINGER US LLP
601 Lexington Avenue, 31st Floor
New York, New York 10022
Telephone:   (212) 277-4000
Facsimile:    (212) 277-4001

Attorneys for Jane Moriarty as Foreign Representative

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 15 |
| NN2 NEWCO LIMITED, | Case No. 19-[_____] |
| Debtor in a Foreign Proceeding. | |

**DECLARATION OF RICHARD P. TETT PURSUANT TO 28 U.S.C.
§ 1746 IN SUPPORT OF VERIFIED PETITION FOR RECOGNITION
OF FOREIGN MAIN PROCEEDING UNDER 11 U.S.C. §§ 1515
AND 1517 AND FOR RELATED RELIEF PURSUANT TO 11 U.S.C.
§§ 105(a), 1507(a), 1520 AND 1521, GIVING FULL FORCE AND
EFFECT TO UK SCHEME OF ARRANGEMENT**

I, Richard P. Tett, declare under penalty of perjury under the laws of the United States of America as follows:

1.  I am a solicitor duly admitted to practice in England and Wales, a partner with the law firm of Freshfields Bruckhaus Deringer LLP ("Freshfields"), and counsel to Nyrstar NV (the indirect parent of NN2, defined below) and certain of its subsidiaries and therefore also counsel to NN2 Newco Limited ("NN2" or the "Debtor") and Jane Moriarty in her capacity as the duly authorized foreign representative of the Debtor (the "Foreign Representative"). I submit this declaration in support of the *Verified Petition For Recognition Of Foreign Main Proceeding Under 11 U.S.C. §§ 1515 And 1517 And for Related Relief Pursuant to 11 U.S.C.*

*§§ 105(a), 1507(a), 1520 And 1521, Giving Full Force and Effect to UK Scheme of Arrangement* (the "Verified Petition"), filed contemporaneously herewith.

2.     As of the date hereof, the Debtor is the subject of a proceeding (the "English Proceeding") pending before the High Court of Justice of England and Wales (the "English Court") concerning a scheme of arrangement (the "Scheme") for the Debtor pursuant to Part 26 of the Companies Act 2006 of England and Wales (the "Companies Act").  Freshfields acts for the Debtor in the English Proceeding, and I am personally familiar with the English Proceeding.

3.     This declaration is comprised of both statements of legal opinion and statements of fact.  Where the matters stated in this declaration are statements of legal opinion, such statements represent my view of English law as a practicing English lawyer.  Where the matters stated in this declaration are statements of fact that are within my personal knowledge, they are true.  Where the matters stated in this declaration are statements of fact that are not within my personal knowledge, they are derived from documents or information supplied to me by or on behalf of the Foreign Representative and are true to the best of my knowledge, information and belief.

4.     In preparing this declaration, I reviewed: (i) the Verified Petition;[1] (ii) relevant provisions of the Companies Act; (iii) the skeleton argument filed with the English Court by the barristers representing the Debtor in the English Proceeding, a copy of which is attached hereto as **Exhibit 1**; and (iv) other provisions of English law and the laws of the European Union as they relate to Chapter 15 of the Bankruptcy Code and other aspects of U.S. bankruptcy law.  All facts set forth in this declaration are based on: (a) my knowledge; (b) my review of the relevant

---

[1]    Any capitalized term used herein but not defined herein shall have the meaning ascribed to such term in the Verified Petition.

2

documents; or (c) my opinion based upon my experience and knowledge of the Debtor's operations. If called to testify, I could and would testify competently to the facts set forth herein.

## PROFESSIONAL BACKGROUND

5. I received a degree from Jesus College, Cambridge University in 1992 (Parts IA and IB Natural Sciences (Biological) and Part II Law). I was admitted to practice as a solicitor in England and Wales on April 15, 1996.

6. I joined Freshfields as a trainee on March 3, 1994, became a partner in the restructuring and insolvency practice group on May 1, 2004, and am currently the head of Freshfields' restructuring and insolvency practice in London.

7. For the past 25 years, my practice has been devoted to, *inter alia*, in-court and out-of-court restructurings and refinancings, English schemes of arrangement, intercreditor agreement disputes, formal insolvency appointments, high yield bond and CMBS bond restructurings and distressed M&A. Cross-border restructurings have been a feature of much of the insolvency work in which I have been involved at Freshfields. Based on the foregoing, I have extensive experience in matters relating to English insolvency law. Further, as a result of my experience in cross-border insolvency matters, I am reasonably familiar with the provisions of Chapter 15 of the United States Bankruptcy Code.

## STATEMENTS OF ENGLISH LAW AND PRACTICE

**I.    Scheme of Arrangement**

8. The Companies Act permits an English company (and certain foreign companies) to use a well-established statutory tool known as a "scheme of arrangement" to impose a compromise or arrangement, including a restructuring of liabilities, agreed upon with the statutory majority of any class of creditors upon each

3

and every creditor in the relevant creditor class subject to the scheme, provided that the English Court sanctions the Scheme.

9. A scheme of arrangement is therefore a useful tool for restructuring all or part of a company's debts as, for example, it can be used to impose the agreed upon restructuring upon dissenting minority creditors within a class who withhold their consent to a restructuring. Notably, one of the uses for schemes of arrangement is the restructuring of debts of companies that are in financial distress, even if those companies are not, in fact, insolvent (or in a formal insolvency process).

10. The scheme process can be commenced by a company, any creditor or member of a company, a liquidator of a company being wound up or an administrator of a company in administration. *See* § 896(2) of the Companies Act. The applicant begins with the preliminary step of circulating a letter, known as a "practice statement letter," to all creditors who will be subject to the compromise or arrangement contemplated by the proposed scheme. Among other things, the practice statement letter will typically set out the applicant's proposed scheme classes and the applicant's case for why the English Court has jurisdiction in relation to the scheme. The practice statement letter will notify the recipient creditors that they have the right to attend the court hearings for the scheme and to object if they consider it necessary.

11. The scheme process begins when an application is made to the English Court in accordance with the Companies Act requesting permission for a hearing (known as a "<u>convening hearing</u>") to convene a separate meeting (known as a "<u>scheme meeting</u>") of each class of the company's creditors proposed to be subject to the scheme to allow them to consider and vote on the proposed

4

compromise or arrangement. *See* § 896 of the Companies Act. Under English law, creditors of a company will form a class for the purpose of voting on the scheme if those creditors' rights against the company, both before and after the implementation of the compromise or arrangement in the proposed scheme, are not so dissimilar as to make it impossible for them to consult together, in relation to the proposed compromise or arrangement, with a view to their common interest taking into account, among other things, the relevant comparator.[2] The applicant for the scheme will propose the creditor classes to the English Court as part of its convening hearing application; however, the decision as to whether the classification of creditors is correct is ultimately one for the English Court, and, in deciding whether to order meetings of the relevant classes of creditors, the English Court will consider whether or not the proposed classes are properly constituted. Scheme creditors are entitled to attend the convening hearing to voice any concerns regarding the proposed scheme, including the composition of the proposed voting class or classes of scheme creditors.

12. The scheme application is supported by a witness statement and a draft explanatory statement, which is a disclosure document provided to scheme creditors (described below in more detail). At the convening hearing, the English Court will decide whether to grant the applicant permission to convene meetings of the relevant classes of creditors to consider and vote upon the proposed compromise or arrangement. In making its decision, the English Court will consider jurisdictional issues as well as review the composition of the proposed voting classes

---

[2] In applying the test as to whether such classes are properly constituted, the relevant comparator, *i.e.*, the hypothetical likely alternative to the proposed restructuring, is identified and the rights of the creditor class in such scenario is analyzed. For example, if a company is insolvent, the relevant comparator is typically liquidation.

5

of scheme creditors. If the English Court does grant the application, it will issue an order authorizing the company to convene the scheme meetings. *See* § 896(1) of the Companies Act.

13. Once permission to convene a scheme meeting has been granted by the English Court, the debtor then sends notice of the scheme meeting and an explanatory statement, which includes the terms of the scheme itself, to all scheme creditors. § 897 of the Companies Act sets out what information must be contained in the explanatory statement.

14. To become legally binding on the company and on all the creditors in the relevant classes:

    a) a majority in number representing not less than 75 percent in value of each class of creditors, present and voting in person or by proxy, must vote in favor of the scheme of arrangement at the scheme meeting for that creditor class;

    b) the English Court must subsequently sanction the scheme of arrangement as approved by each class of creditors at the scheme meeting; and

    c) a copy of the order of the English Court to that effect must subsequently be delivered to the Registrar of Companies in England and Wales, at which point the scheme becomes binding on its terms.

15. The English Court must also be reasonably assured that the scheme will achieve its purpose and this includes that it will be given effect in relevant jurisdictions. Once the convening order is issued, notice of the scheme meetings

must be given to all scheme creditors prior to the meetings in accordance with the convening order.  Such notice must be accompanied by the explanatory statement containing sufficient information regarding the company and the effects of the proposed compromise or arrangement so as to allow a typical scheme creditor to make a reasonable decision regarding whether to support the proposed scheme.  I understand that the explanatory statement is comparable to the disclosure statement required under section 1125 of the Bankruptcy Code for solicitation of votes on a Chapter 11 plan.  Scheme creditors are entitled to attend the scheme meeting in person or by proxy and to ask questions regarding the proposed scheme.

16.    As noted above, each class of scheme creditors will consider and vote on the proposed scheme separately.  A majority in number representing not less than 75 percent in value of each class of creditors, present and voting in person or by proxy, must vote in favor of the scheme of arrangement at the scheme meeting for that creditor class in order for the scheme to be approved.  *See* § 899(1) of the Companies Act.  If any class of scheme creditors does not approve the scheme, the scheme cannot proceed.  Thus, unlike the confirmation provisions of Chapter 11 of the Bankruptcy Code, a scheme does not have a mechanism for "cramming down" classes that do not vote in favor of the scheme.

17.    The voting majorities are confirmed by a chairperson appointed for the purpose of conducting the scheme meeting.  To confirm the voting majorities, the chairperson (often with the assistance of an agent appointed specifically to assist the company with this task) tabulates the votes submitted by scheme creditors.  The value of each scheme creditor's claim for voting purposes will typically be the face value of the actual claim of that scheme creditor (with discounts applying to claims that are unascertained, contingent or disputed in part) against the company, which

for bondholders and lenders is typically under the existing debt documents, as of a specific date fixed prior to the scheme meeting. If the requisite majorities of attending and voting scheme creditors approve the scheme, the chairperson provides a sworn statement to the English Court as evidence of the result.

18. Following the scheme meetings, the company will apply to the English Court to sanction the scheme at a second hearing, which is referred to as a "fairness hearing" or "sanction hearing," to determine whether the English Court should sanction, or approve, the scheme and make the compromise or arrangement binding on all of the scheme creditors, irrespective of how they voted (or did not vote) on the scheme. I understand that the sanction hearing is comparable to a confirmation hearing on a Chapter 11 plan of reorganization under section 1128 of the Bankruptcy Code. At the sanction hearing, all scheme creditors have an opportunity to raise questions and objections to the scheme and present evidence.

19. At the sanction hearing, the English Court may: (i) sanction the scheme unconditionally; (ii) sanction the scheme conditional upon certain modifications or amendments to the scheme; or (iii) refuse to sanction the scheme. In deciding whether to sanction the scheme at the sanction hearing, the English Court will consider whether:

    a) the compromise or arrangement proposed by the scheme is such that an intelligent and honest person, being a member of the relevant class of scheme creditors concerned and acting in respect of his or her interest, might reasonably approve;

    b) the scheme is fair, taking into account the interests of the scheme creditors, the nature of the scheme's impact

8

      upon dissenting scheme creditors, and whether each class was fairly represented by those attending the scheme meetings acting in good faith; and

    c) the applicable statutory and procedural requirements have been fulfilled, including whether the requisite majorities of voting scheme creditors approved the scheme.

  20. The English Court does not judge the business merits of proposed schemes and generally refrains from second-guessing commercial decisions made at scheme meetings.

  21. If the English Court sanctions a scheme, the scheme will only take effect once a certified copy of the English Court's order sanctioning the scheme, known as a "sanction order," has been delivered to the Registrar of Companies of England and Wales.  Upon such delivery, the scheme is binding and effective according to its terms on all scheme creditors, irrespective of notice and their participation at any scheme meeting.

## II. Third Party Releases

  22. It is well established that the Court has jurisdiction under Part 26 CA 2006 to sanction a scheme which includes a mechanism (usually the execution of a deed of release by an attorney appointed under the scheme) under which scheme creditors are required to release claims against third parties where such a release is necessary in order to give effect to the arrangement between the company and the scheme creditors.  That test is most clearly satisfied where the scheme compromises debts which are guaranteed and where, absent such a release, pursuit of the

9

guarantor by a scheme creditor would undermine the compromise between the creditor and the company.[3]

It is also now well established[4] that a company through a scheme of arrangement may cause the release of its creditors' claims under guarantees provided by third parties where the guarantees are of the debt being compromised under the scheme. Such releases ensure, among other things, that the company is free from claims of counter-indemnity that might otherwise be brought against it by those third parties, which would otherwise undermine the compromise or arrangement provided for by the scheme. But this has not been limited to guarantees and claims closely connected to scheme claims.[5] Recent case law indicates that the release of claims against persons involved in the preparation, negotiation or implementation of a scheme and their legal advisors would also be within the scope of Part 26 of the Companies Act 2006. Such clauses can be justified by a need not to allow scheme creditors to undermine the terms of the scheme itself, and have become a regular feature of schemes.[6]

23. These tests ensure that the ability to release third-party claims through a scheme is appropriately circumscribed, unlikely to be exploited or abused, and within the jurisdiction of the English Court.

---

[3]   *See, Noble Group Limited* [2018 EWHC 3092 (Ch)], paragraph 24.

[4]   *See, Re Lehman Brothers International (Europe) (In administration)* (No 2) [2009] EWCA Civ 1161 (Patten LJ held (at paragraph 63) that it was "entirely logical to regard the court's jurisdiction as extending to approving a scheme which varies or releases creditors' claims against the company on terms which require them to bring into account and release rights of action against third parties designed to recover the same loss. The release of such third party claims is merely ancillary to the arrangement between the company and its own creditors."); This was reaffirmed by Snowden J in the matter of *Noble Group Limited* [2018 EWHC 3092 (Ch)] .

[5]   *See, Noble Group Limited* [2018 EWHC 3092 (Ch)], paragraph 25.

[6]   *See, Far East Capital Limited SA* [2017] EWHC 2878 (Ch), paragraph 14.

10

24. In the case of NN2's Scheme, I believe that these tests are met. The Scheme contemplates certain non-consensual third party releases (the "Releases") of obligations and liabilities of guarantors (the "Guarantors") of the Existing Notes and the Existing Convertible Bonds, as well as the releases of certain other third parties and advisers connected to the restructuring through entry into a global deed of release and the Scheme. The Releases are essential because without them any amounts the Guarantors paid on the debt to the holders of the Existing Notes and the Existing Convertible Bonds would merely be transformed into contribution or subrogation claims of each Guarantor against the Debtor and/or the other Guarantors. For the same reason, the "close connection" and "reduction in claims against the company" requirements are met. The Releases are essential and ancillary to the compromise embodied in the Scheme because the guarantees cover the same debt as will be adjusted under the Scheme. The released rights are for satisfaction of a debt and are thus personal rather than proprietary in nature. Without the Releases, demands for payment would mean that the Guarantors would have to undergo uncertain and expensive restructuring alternatives or liquidate. The other third party releases (relating to parties and advisers connected to the restructuring) are justified because the Scheme is intrinsically connected with those releases and the Scheme and the wider restructuring would not take effect without such releases being granted. Such other third party releases are commonly found in schemes.

25. In the present circumstances, a requisite "give and take" between the Guarantors and the holders of the Existing Notes and the Existing Convertible Bonds will be present to allow for a release of third-party guarantee claims given that they relate to such holders' claims against the Debtor. Furthermore, the overall Scheme

inures to the benefit of the holders of the Existing Notes, the holders of the Existing Convertible Bonds and the Guarantors because the Scheme Creditors are receiving new financial instruments issued by Trafigura entities (outside of the Debtor's group) in exchange for the release of their claims.  As disclosed in the Explanatory Statement (as defined below), the value of the new instruments to be received by the Scheme Creditors represents 43-51 per cent of the aggregate principal outstanding and accrued interest under the Existing Notes and Existing Convertible Bonds.  The evidence is that this is a much better recovery than the Scheme Creditors would receive if the Scheme did not take effect.  The alternative to the Scheme would likely be a recovery in an insolvency scenario where Alvarez & Marsal Europe LLP has estimated Scheme Creditors would recover between 0.9% and 11.9% of their debt.

26.    Given that the Releases are essential to the Scheme and the restructuring, the Foreign Representative will be seeking to enforce such Releases by obtaining recognition of the Scheme in this Chapter 15 case and an order giving effect to the Scheme, including the Releases in the United States.

### III.    The Debtor's English Proceeding

27.    On June 19, 2019, the Debtor issued a practice statement letter (the "Practice Statement Letter"), through Euroclear and Clearstream, and the respective trustees for the 2019 Notes, the 2024 Notes and the Existing Convertible Bonds, to the holders of the Existing Notes and the Existing Convertible Bonds (collectively, the "Scheme Creditors"), who are the sole creditors that will be affected by the Scheme.  Among other things, the Practice Statement Letter notified the Scheme Creditors of the Debtor's intention to propose the Scheme, the Debtor's intention to apply to the English Court for permission to convene two separate Scheme Meetings for the purpose of voting on the Scheme, and the composition of the two classes of

creditors to vote on the Scheme. A copy of the Practice Statement Letter is attached as **Exhibit 6** to the Verified Petition. The Practice Statement Letter was posted on the Scheme website at www.lucid-is.com/nyrstar/.

28. On July 1, 2019, the Debtor applied to the English Court for permission to convene the Scheme Meetings. The application to the English Court was accompanied by a draft explanatory statement (the "Explanatory Statement") and all documents appended thereto (including the Scheme, which is attached as Part II to the Explanatory Statement) which is attached as **Exhibit 4** to the Verified Petition.

29. On July 4, 2019, the English Court held the convening hearing and subsequently issued a convening order (the "Convening Order"), which is attached as **Exhibit 1** to the Verified Petition. The English Court found that it had jurisdiction in relation to the Scheme and: (i) authorized the Debtor to convene the Scheme Meetings to be held on July 22, 2019 or such later date as the Debtor may determine to consider and vote upon the Scheme; and (ii) approving the appointment of the Foreign Representative to act as the foreign representative of the Debtor in connection with this Chapter 15 case.

30. It is currently anticipated that the Sanction Hearing in respect of the Scheme will be held on or about July 26, 2019. If the English Court enters the order (the "Sanction Order") sanctioning the Scheme, then upon delivery of the Sanction Order to the Registrar of Companies of England and Wales, the Scheme will become effective under English law and thereby binding on all Scheme Creditors wherever located.[7]

---

[7] Notably, non-UK-domiciled creditors have the same rights to participate in and vote at the Scheme Meetings, participate at and raise questions at both English Court hearings in relation to the Scheme, and appeal the English Court's orders as creditors from the UK.

13

31. However, this Court's issuance of an order recognizing the English Proceeding and giving full force and effect to the Scheme in the United States under Chapter 15 of the Bankruptcy Code is a condition precedent to the implementation of the Scheme. Thus, although the Scheme would be effective under English law, by its terms, it may not be implemented unless and until this Court has issued an order recognizing the Scheme and granting it full force and effect in the United States.

32. Accordingly, the relief requested by the Foreign Representative under Chapter 15 of the Bankruptcy Code is necessary to implement the Scheme and also to give effect to the Scheme in the United States, and such relief will best assure an economical and efficient administration of the Scheme that protects the best interests of the Debtor and the Scheme Creditors.

## **CONCLUSION**

33. I hereby declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury under the laws of the United States of America that the information set forth above is true and correct to the best of my knowledge, information and belief.

[*Rest of page intentionally left blank.*]

Executed on this 9th day of July, 2019

_____
Richard P. Tett